UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Paradise Farms, S.A., et al.,

    Plaintiffs,

v.

Chiquita Frupac, Inc.,

    Defendant.

Case No. 1:02cv714

Judge Michael H. Watson

## OPINION AND ORDER

Before the Court are the following:

1. The April 5, 2004 Motion of Plaintiffs Paradise Farms, S.A. and Cultivos de Vegetales del Sur S. de R.L. de C.V. (hereinafter collectively "Plaintiffs") for Leave to File Second Amended Complaint (Doc. 37). Chiquita Frupac, Inc. (hereinafter "Defendant") filed a Response in Opposition on April 26, 2004 (Doc. 38).  Plaintiffs filed a Reply Memorandum on May 12, 2004 (Doc. 41).

2. The May 13, 2004 Motion of Plaintiffs to Correct Motion for Leave to File Second Amended Complaint by Filing Second Amended Complaint (Doc. 42). Defendant filed a Response in Opposition on June 1, 2004 (Doc. 45). Plaintiffs filed a Reply Memorandum on July 1, 2004 (Doc. 48).

3. The November 17, 2004 Motion of Defendant for Summary Judgment (Doc. 64).  Plaintiffs filed a Responsive Memorandum on December 31, 2004 (Doc. 100).  Plaintiffs filed a Supplemental Responsive

    Memorandum on January 3, 2005 (Doc. 103). Defendant filed a Reply Memorandum on January 11, 2005 (Doc. 106).

4.  The November 17, 2004 Motion of Plaintiffs for Partial Summary Judgment (Doc. 65). Defendant filed a Responsive Memorandum on December 31, 2004 (doc. 98). Plaintiff filed a Reply Memorandum on January 11, 2005 (Doc. 104).

## I.  FACTS

On October 26, 2001, Plaintiffs entered into a Marketing Agreement (hereinafter "Agreement") (Doc. 65, Exh.1) with Defendant for the 2001-2002 winter melon season. The Agreement required Plaintiffs to provide cantaloupes, honeydews, seedless watermelons, Athena Melons and Seeded Watermelons to Defendant for marketing by Defendant in the United States. During the negotiation of the Agreement, the parties were represented by sophisticated commercial lawyers. Attorneys for each side approved every aspect of the Agreement (R. Nir Depo., pp. 117-18). The Agreement states it embodies the entire agreement of the parties and is to be construed under Ohio law (Agreement, ¶¶ 12-13).

The Agreement established, *inter alia*, the procedure and formula by which Defendant determined the profit or loss resulting from the melon sales and how the profit or loss would be divided between Plaintiffs and Defendant. Plaintiffs allege Defendant breached the Agreement by failing to properly calculate the profit or loss in the manner required by the Agreement.

On April 18, 2005, the Court held oral arguments on the parties' respective Motions for Summary Judgment.

## II. ANALYSIS

### A. Leave to Amend

Plaintiffs seek leave, pursuant to Fed. R. Civ. Pro. 15(a), to file their Second Amended Complaint. Plaintiffs attempt to cure deficiencies in the pleadings from the First Amended Complaint which resulted in the dismissal of its claims for negligence, indemnification and declaratory judgment related to the Suragroh warehouse fire (Doc. 34). However, Defendant contends if the Court were to grant Plaintiff leave to amend their First Amended Complaint if would not cure the inherent deficiencies identified in the February 20, 2004 Order of Judge Susan J. Dlott (Doc. 34)

Fed. Civ. R. Pro. 15(a) provides that leave to amend "shall be freely given when justice so requires."  Nonetheless, a Court shall examine whether a proposed amendment would be futile. A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss. *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 518 (6th Cir. 2001). A complaint may be dismissed for failure to state a claim "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). The court must view the complaint in the light most favorable to the plaintiff and accept the well-pled facts as true but need not accept legal conclusions or unwarranted factual inferences as true. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987).

As argued by Defendant, an examination of Plaintiffs' proposed Second Amended Complaint results in the conclusion the amendments with respect to the Surogroh warehouse fire are futile. The newly asserted arguments fail to alter the Court's previous Order, wherein the Court felt under the facts alleged that, "any breach by Defendant was a breach of an obligation created by the Agreement rather than an obligation imposed by law". As such the Court held, "Defendant has no tort-liability for any fire-related losses".

The factual development Plaintiffs seek to assert in the Second Amended Complaint fails to change the Court's previous analysis. There is nothing in the Second Amended Complaint which alters Defendant's obligation to Plaintiffs from a breach of the Agreement to one imposed by law.

Accordingly, the April 5, 2004 Motion of Plaintiffs for Leave to File Second Amended Complaint (Doc. 37) is hereby **DENIED** and the May 13, 2004 Motion of Plaintiffs to Correct Motion for Leave to File Second Amended Complaint by Filing Second Amended Complaint (Doc. 42) is hereby **DENIED**.

B. *Summary Judgment*

1. Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(C). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex*

Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). The mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the non-moving party. Id. at 252.

    2.  Breach of Contract

In construing any written instrument, the primary and paramount objective is to ascertain the intent of the parties. The general rule is that contracts should be construed so as to give effect to the intention of the parties. Employers' Liability Assurance Corp. v. Roehm, 99 Ohio St. 343, syllabus; Skivolocki v. East Ohio Gas Co., 38 Ohio St. 2d 244, paragraph one of the syllabus (1974). In matters of construction, "...it is the duty of this court to give effect to the words used, not to delete words used or to insert words not used." Columbus-Suburban Coach Lines v. Pub. Util. Comm., 20 Ohio St. 2d 125, 127 (1969) (Emphasis added). Moreover, common words appearing in a contract shall be given their ordinary meaning, unless, either manifest absurdity results, or another meaning is clearly evident from the face or overall contents of the instrument. Aultman Hospital Assoc., v. Community Mutual Ins. Co., 46 Ohio St. 3d 51, 54 (1989).

Where the parties, following negotiations, make mutual promises which thereafter are integrated into an unambiguous written contract, duly signed by them, courts will give effect to the parties' expressed intentions. Henderson-Achert

*Lithographic Co. v. John Shillito Co.*, 64 Ohio St. 236, 252 (1901). *See, also, Charles A. Burton, Inc. v. Durkee*, 158 Ohio St. 313 (1952). Intentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence. *See Charles A. Burton, Inc.*, paragraph two of the syllabus; *Steel Sanitary Co. v. Pangborn Corp.*, 38 Ohio App. 65, 70 (1930). There can be no implied covenant in a contract in relation to any matter which is specifically covered by the written terms of the contract. *Kachelmacher v. Laird*, 92 Ohio St. 324, paragraph one of the syllabus (1915).

Plaintiffs argue Defendant guaranteed its sales performance by promising Plaintiffs they would receive at least 95% of the "Mostly Price"[1] published by the U.S. Department of Agriculture (hereinafter "USDA") on a "per carton" basis. Defendant asserts it properly applied the price guarantee as required by the Agreement and Plaintiffs invented a method for calculating the price guarantee which allows them to double dip, through two separate applications of the price guarantee. However, Defendant argues the Agreement provides for only one application of the price guarantee.

The relevant sections of the Agreement are as follows:

\*\*\*

**7.      Marketing and Sales**

\*\*\*

---

[1] The Agreement defines "Mostly Price" as "the average 'mostly' price reported by the USDA Market News, Shipping point South Florida, during the 5 days after the Fruit has arrived at the Receiving Warehouse.:

  (b) <u>Commissions for USDA No. 1 Grade Produce; Vessel by Vessel Liquidations of Athena Melons and Seeded Watermelons.</u>

    [Defendant] shall receive a commission ("Commission") for the sale of USDA No. 1 Grade Produce based on the net F.O.B. shipping point prices per carton charged by [Defendant] to its customers for the Produce, including all applicable upcharges for cooling and handling ("Sales Price") in an amount equal to six percent (6%) of the Sales Price;... [Defendant] guarantees that the sales price per carton for Fruit only (not Produce) which is not Rejected Produce shall be not less than 95% of the Mostly Price for the Fruit.[2]

          ***

  (g) <u>End of Season Liquidation for Fruit; Sharing of Excess</u>

    (i) On or before ten (1) days after the End of the Season, [Defendant] shall prepare the End of Season Liquidation with respect to the Fruit and pay to [Plaintiffs] the End of Season Liquidation Amount (defined below). The amount due to [Plaintiffs] pursuant to the End of Season Liquidation will be what is left after subtracting the following from the Sales Price for all of the Fruit, in the following order of priority ("End of Season Liquidation Amount").

      (A) the aggregate amount of all advances made pursuant to Paragraph 7(a) hereof;

      (B) The Commission, as adjusted in subparagraph 7(e) above and as further adjusted herein; for purposes of the End of Season Liquidation, the Commission for the Fruit shall be taken on the number equal to the sum of the Reference Price plus fifty percent (50%) of the Excess Amount, if any, calculated on a per carton basis, described below; and

---

[2] The Court shall refer to this as the "95% Guarantee".

    (C)  all expenses incurred by [Defendant] under this Agreement for the [ Plaintiffs'] account, including, without limitation, the costs of any and all Required Operations other than those already paid by [Plaintiffs].

The Excess Amount, calculated on a per carton basis, whether positive or negative, shall be shared equally by [Defendant] and [Plaintiffs], and shall be added to (or subtracted from, as the case may be,) [Plaintiffs'] End of Season Liquidation Amount in the End of Season Liquidation by [Defendant]. For purposes of this Agreement, the Excess Amount shall equal the difference, positive or negative, between (x) and (y), where (x) equals the greater of: the average Sales Price for the Fruit or ninety-five percent (95%) of the USDA Mostly Price for the Fruit, and where (y) equals the Reference Price for the Fruit. For purposes of this Agreement, the term "mostly Price" shall mean the average "mostly" price reported by the USDA Market News, shipping point South Florida, during the first five days after the Fruit has arrived at the Receiving Warehouse...This calculation shall be done separately for each type of Fruit specified in <u>Schedule 7(a)</u>.

***

### a.  "Sales Price" Definition and 95 % Guarantee

First, the Court examines Plaintiffs' contention that "Sales Price" set forth in 7(g), for calculating the End of Season Liquidation Amount, equates to the 95% Guarantee. Specifically, Plaintiffs contend calculating the End of Season Liquidation Amount begins with the "'Sales Price' for 'All' of the 'Fruit,' as guaranteed by [Defendant] at 95% of the 'Mostly Price'". However, the Court does not agree with Plaintiffs' interpretation. First, the definition of "Sales Price" is not as expansive as argued by Plaintiffs. Contrary to Plaintiffs' position, the definition of "Sales Price" does not include the second sentence of ¶7(b). If this was the parties intent, the insertion in ¶7(b) of ("Sales Price"), to indicate the defined term for the previously set forth definition, would be at the end of the second

sentence, as opposed to the middle of the first sentence. An examination of the Agreement reveals that other specifically defined terms are set out generally at the end of the definition, not in the middle, and not before the inclusion of another sentence meant to be a part of the definition. For example:

> ¶1(a): "[Plaintiffs] hereby appoint[ ] [Defendant] as non-exclusive agent in North America and Europe (the "Market")....
>
> ¶1(b): "[Plaintiffs] shall provide to [Defendant] pallatized cantaloupes, honeydews and seedless watermelons (collectively "Fruit")....¶2(a): "[Plaintiffs] hereby warrant[ ] and guarantee[ ] that each of the Fruit, Seeded Watermelons and Athena Melons (hereinafter collectively referred to as "Produce")

Alternatively, it could have been more succinctly stated, as the definition of "Rejected Fruit" in ¶2(c)(I):

> For purposes of this Agreement, the term "Rejected Produce" shall mean any Produce that does not meet the Aggregate Specification, does not meet the USDA Grade No. 1 standard for first quality fruit..., the USDA Grade No. 1 standard relating to sugar for second quality fruit...or is Produce otherwise described in paragraphs 2(b)(ii) hereof.

Accordingly, when the definition of "Sales Price" is to be inserted into the meaning of a sentence, it does not include the 95% Guarantee.

Moreover, as "Sales Price" is a specifically defined term in the Agreement it is set-off by the use of initial capitals. As such, the definition for "Sales Price", as set forth in ¶7(b), only applies when the term "Sales Price", with initial capitals, is used. Turning to the language of the 95% guarantee, it states "...the *sales price* per carton...shall be no less than 95%...." and not "...the *Sales Price* per carton...shall be no less than

95%...". Therefore, as the parties stated "sales price" in the 95% guarantee, the ¶7(b) definition of "Sales Price" is not to be read into the 95% Guarantee.

Accordingly, in calculating the End of Season Liquidation Amount, the amount Defendant is to calculate and start with is the "Sales Price for all Fruit"[3], which is the amount received based on the "net F.O.B. shipping point prices per carton charged by [Defendant] to its customers for the [Fruit] including all applicable upcharges for cooling and handling..." (Agreement ¶7(b)). It does not include the 95% Guarantee. To conclude otherwise expands the definition of "Sales Price" to include the 95% guarantee and improperly alters the term of the Agreement.

The Court's conclusion does not render meaningless the 95% Guarantee. Instead, it permits its proper application. In calculating the Excess Amount, the first part of the calculation is (x), which is the "greater of: the average Sales Price for the Fruit or the ninety-five percent (95%) of the USDA Mostly Price for the Fruit...." As such, in conducting this comparison to calculate the Excess Amount, Plaintiff is assured the (x) variable will be, at a minimum, equal to, and may, be greater than the 95% Guarantee.

### b. Excess Amount and End of Season Liquidation Amount

The next issue is the relationship, in ¶ 7(g), between the End of Season Liquidation Amount and the Excess Amount. As argued by Plaintiffs, these are two separate and distinct terms. First, the caption to ¶7(g) separates these terms by a semi-colon, which indicates, while related, they are independent concepts. Second, the

---

[3]"Fruit" is defined as "cantaloupes, honeydews and seedless watermelons" (Agreement ¶1(b)). The Court notes that it may use the terms Produce and Fruit interchangeably. This is not to undermine the specific definitions of these terms.

paragraph following ¶7(g)(i)(C), states the Excess Amount shall be added to/subtracted from the End of Season Liquidation Amount in the End of Season Liquidation. To hold that the Excess Amount was intended by the parties to be interpreted as part of the equation in calculating the End of Season Liquidation Amount, would require this language to be ignored in the Agreement. As such, the Court finds the Excess Amount was intended to be a separate equation from the End of Season Liquidation Amount. It is the End of Season Liquidation Amount and the Excess Amount which completes the End of Season Liquidation. Accordingly, to properly render the End of Season Liquidation, Defendant must perform both the equation for the End of Season Liquidation Amount and the Excess Amount.

### c. Per Carton

Next, the Court turns to the manner in which the End of Season Liquidation Amount and the Excess Amount are calculated. The calculation begins with "the Sales Price for all the Fruit". As previously stated, this does not include the 95% Guarantee. Instead, it is "'the net F.O.B. shipping point prices *per carton* charged by [Defendant] to its customers for the [Fruit], including all applicable upcharges for cooling and handling' for all the Fruit." As argued by Plaintiffs, ¶7(g)(i) does not permit the "Sales Price" to be a seasonal average. ¶7(g)(i) is devoid of any term or phrase which could be interpreted to allow the "Sales Price for the Fruit" to be a number which is a seasonal average. Instead, the Court finds it clearly mandates the "Sales Price" is to be determined for each carton.

With respect to the Excess Amount, the Agreement states "[t]he Excess Amount, calculated on a *per carton* basis,...." (Emphasis added). As such, the Excess Amount must be calculated on a per carton basis. In other words, each variable of the equation, (x) and (y), must be calculated on a per carton basis.

Beginning with the (x) variable, the Agreement provides where (x) equals the greater of: the average "Sales Price" for the Fruit (hereinafter "Variable (x)(1)") or 95% of the USDA Mostly Price for the Fruit (hereinafter "Variable (x)(2)").[4]

As to Variable (x)(1), the per carton calculation is already considered as the definition of "Sales Price" states "net F.O.B. shipping point prices *per carton*". (Emphasis added). However, Variable (x)(1) also requires the per carton calculation be averaged, "the *average* Sales Price for the Fruit." (Emphasis added). Turning to Variable (x)(2), the language of the Agreement requires it be calculated on a per carton basis. This conclusion is supported by the fact Variable (x)(2) is, as discussed above, the application of the 95% Guarantee in ¶7(b), which states "sales price *per carton*". (Emphasis added). Moreover, the Court notes that while the 95% Mostly Price shall be calculated on a per carton basis, the determination of the per carton 95% Mostly Price is "the *average* 'mostly' price reported by the USDA...during the five days after the Fruit has arrived at the Receiving Warehouse." (Emphasis added). Accordingly, the per carton determination is an average of the "mostly price" during the specified period. However, as argued by Plaintiff, this does not permit Defendant, in calculating the

---

[4]The Court's use of "Variable (x)(1)" and "Variable (x)(2)" is merely for ease of reading. They are not specifically mentioned in the Agreement and the Court does not mean to insert new terms into the Agreement.

Excess Amount, to then average the per carton determinations into a seasonal average. Instead, it is a comparison, of Variable (x)(1), the average Sales Price for the Fruit, based on the prices per carton, to Variable (x)(2), the per carton 95% Mostly Price, which is an averaged price derived from the "mostly price" reported during the five day period. As required by the Agreement, the figure which is the greater number is the (x) variable in the Excess Amount Equation. Finally, as with the (x) variable, the (y) variable, the Reference Price, must also be calculated on a per carton basis.[5]

### d. Sol Label and 95% Guarantee

The next issue is whether the Agreement permitted the packaging of USDA No. 1 Fruit under the Sol label. Schedule II of the Agreement sets forth the packing specifications for all Produce. Specifically, as to USDA No. 1 Produce, it states, "...in the case of *all* USDA No. 1 Grade Produce, the packing carton and/or cartons *will* bear the 'Chiquita' label." As defined in Black's Law Dictionary, "will" is "an auxiliary verb commonly having the mandatory sense of 'shall' or 'must.' It is a word of certainty, while the word 'may' is one of speculation and uncertainty." BLACK'S LAW DICTIONARY 1598 (6th ed. 1990). Accordingly, the use of "will" in this clause of Schedule II requires all Produce meeting the requirements of USDA No. 1 Grade to be packaged under the Chiquita label, not the Sol label.

Resolution of the packaging issue with respect to USDA No. 1 Fruit, does not resolve whether the 95% Guarantee applies to second quality Fruit. As previously

---

[5]The Court notes Schedule 7(a), which sets forth the Reference Price for the Fruit, states, "1. Cantaloupe and Honeydew in Cartons; Watermelon in Pounds."

discussed, the 95% Guarantee is not included in the definition of "Sales Price". Moreover, as stated above ,the definition of "Sales Price" is, "the net F.O.B. shipping point prices per carton charged by [Defendant] to its customer for the Produce, including all applicable upcharges for cooling and handling". This definition does not include the following language from ¶7(b), "[Defendant] shall receive a commission...for the sale of USDA No. 1 Grade Produce...in an amount equal to six percent (6%) of the Sales Price". Accordingly, contrary to the arguments advanced by both parties, "USDA No. 1 Grade" in ¶7(b) does not refer to either the "Sales Price" or the 95% Guarantee. Instead, it establishes that Defendant's 6% Commission[6] shall only be received for the sale of USDA No. 1 Grade Produce.

Turning to the End of Season Liquidation and Excess Amount, the Court first notes that ¶7(g) is devoid of any mention of the term USDA No. 1 Grade. Moreover, inserting the definitions for the defined terms into ¶7(g), results in USDA No. 1 Grade being inserted only into ¶7(g)(B), which mandates the deduction of Defendant's Commission from the "Sales Price" for all the Fruit. As such, there is nothing in the language of either ¶7(b) or of ¶7(g), which limits the End of Season Liquidation, the End of Season Liquidation Amount or the Excess Amount to USDA No. 1 Fruit. Moreover, if the parties intent was to limit the End of Season Liquidation Amount and the Excess Amount to only USDA No. 1 Fruit, limiting language could easily have been included in ¶7(g). To adopt Defendant's interpretation requires the divining of the parties' intent, to

---

[6] The Court notes the Agreement sets forth guidelines for the adjustment of the Commission in ¶7(e). As such, the use of the 6% in this sentence is a generalized concept based on the language set forth in ¶7(b).

an easily stated concept, in an obtuse manner Accordingly, the calculation of the End of Season Liquidation Amount and the Excess Amount include USDA No. 1 Grade and second quality Fruit.[7]

### 3. Fraudulent Inducement

Defendant's attempt to dismiss Plaintiffs' claim for fraudulent inducement was previously denied. As it appears Defendant did not apply the Agreement in a manner consistent with this Court's interpretation, genuine issues of material fact remain for trial as to Plaintiffs' claim for fraudulent inducement.

### 4. Perishable Agricultural Commodities Act ("PACA")

In addition, as it appears Defendant did not apply the Agreement in a manner consistent with this Court's interpretation, genuine issues of material fact exist as to Plaintiffs' claim for violation of PACA.

## III. CONCLUSION

Based upon the above analysis, the Court finds the definition of the term "Sales Price" does not include the 95% Guarantee. As such, the 95% Guarantee is not applied at the beginning of the End of Season Liquidation Amount calculation. Furthermore, in calculating the Excess Amount, the Mostly Price is not a seasonal average. Additionally, there is no language in the Agreement which supports limiting the End of Season Liquidation Amount and Excess Amount to USDA No. 1 Grade Fruit.

---

[7]As all USDA No. 1 Grade Fruit was to be packaged under the Chiquita label, the packaging of USDA No. 1 Grade Fruit under the Sol label would be a violation of the Agreement. Accordingly, in calculating the End of Season Liquidation Amount and the Excess Amount, all Fruit packaged under the Sol label must be considered second quality Fruit.

Accordingly, the November 17, 2004 Motion of Defendant for Summary Judgment (Doc. 64) is hereby **GRANTED IN PART** and **DENIED IN PART**; the November 17, 2004 Motion of Plaintiffs for Partial Summary Judgment (Doc. 65) is hereby **GRANTED IN PART** and **DENIED IN PART**.

Defendant is hereby **ORDERED** to conduct an accounting of the End of Season Liquidation Amount and Excess Amount in a manner consistent with the Court's Opinion and Order and within thirty days of the filing of the Order and provide it to Plaintiffs. Moreover, Defendant is **ORDERED** to provide detailed documentation to Plaintiffs of the manner in which the accounting is performed within thirty days of the filing of the Opinion and Order.

**IT IS SO ORDERED.**

Michael H. Watson
United States District Judge