UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

PARADISE FARMS, S.A., et al.,

    Plaintiffs,                                             Case Number 1:02cv714

vs.                                                          Judge Michael R. Barrett

CHIQUITA FRUPAC, INC.,

    Defendant.

## OPINION AND ORDER

This matter is before the Court pursuant to the following motions: First Motion to Exclude Expert Witnesses (Doc. 44); Motion in Limine to Exclude Parol Evidence (Doc. 47); Motion for Disclosure of Witnesses to be Produces at Trial (Doc. 123); Motion for Order to Set Date for Submission of Final Pre-Trial Order and Jury Instructions (Doc. 124); Motion in Limine to Prelude Reference to Alleged Food Safety Issues (Doc. 125); and Motion for hearing for Pretrial Conference (Doc. 128). Each of the above referenced motions is hereby DENIED. Following this Opinion and Order, either party may refile any such motion as a motion in limine prior to any trial that may be had in accordance to this Court's trial procedures.

Also pending before this Court is Plaintiffs' Motion to Compel and Motion for Rehearing and Clarification (Doc. 142). Defendant filed a memorandum in opposition to the motion (Doc. 147) in which it also moves to reconsider Judge Watson's order on summary judgment (Doc. 130). Plaintiffs' replied in support of its motion (Doc. 150) and

filed a memorandum in opposition to Defendant's motion (Doc. 151).  A hearing was held on this motion on June 27, 2007.

Procedural Background

The factual background of this case has been sufficiently set out in Judge' Watson's Opinion and Order of March 10, 2006 (Doc. 130) and will not be recited here except to say that the parties entered into a Marketing Agreement (hereinafter "Agreement") whereby Chiquita, in exchange for a commission, sold the Plaintiffs' melons on consignment.  Each party filed a motion for summary judgment (Doc. 64 and 65) which Judge Watson granted, in part, and denied, in part.  Judge Watson found that the definition of the term "Sales Price" does not include the 95% Guarantee and thus, the 95% Guarantee is not to be applied at the beginning of the End of Season Liquidation Amount calculation.  Judge Watson further found that in calculating the Excess Amount, the Mostly Price is not a seasonal average.  Additionally, there is no language in the Agreement which supports limiting the End of Season Liquidation Amount and Excess Amount to USDA No. 1 Grade Fruit.  Finally, Judge Watson ordered the Defendant to conduct an accounting of the End of Season Liquidation Amount and Excess Amount in a manner consistent with his Opinion and Order.

Each party has filed a motion to reconsider and/or clarify Judge Watson's Opinion and Order.  Many of these arguments are just restatements of prior motions. Plaintiffs request the following of this Court:

1. Compel Chiquita to account for and pay the Sales Prices charged to its customers not the collected amount;
2. Compel Chiquita to disclose their accounting for each sale on a "Per Carton" basis;
3. Reconsider Judge Watson's interpretation of the Sales Price and the 95% Guarantee;

4. Clarify the calculation of the Excess Amount
5. Reconsider Judge Watson's denial of Plaintiffs' leave to amend the complaint so as it is only limited to the Honduran warehouse fire.

Defendant's request the following of this Court:

1. Confirm Judge Watson's interpretation of the Sales Price and the 95% Guarantee;
2. Confirm Judge Watson's decision denying Plaintiffs' leave to file another amended Complaint;
3. Find that Chiquita complied with Judge Watson's Opinion and Order when performing the ordered accounting by using the amounts paid by Chiquita's customers for the melons;
4. Find that Chiquita's accounting filed with the Court documented in detail "the manner in which" that accounting was performed;
5. Reconsider Judge Watson's denial of, and apply Sixth Circuit black letter law to grant, summary judgment to Chiquita on the Growers' fraudulent inducement and Perishable Agricultural Commodities Act ("PACA") claims;
6. Order the parties to a settlement conference.

Sales Price, 95% Guarantee and Excess Amount

The Court will start with the Sales Price and 95% Guarantee.  Despite Plaintiffs' assertions to the contrary, Judge Watson's analysis and holding as to the Sales Price and the ninety-five percent (95%) of the USDA Mostly Price for the Fruit (hereinafter referred to as the "95% Guarantee") is correct.  In addition to the reasons set forth in Judge Watson's order, this Court finds further support that the 95% guarantee does not apply to the Sales Price in Section 7(g)(I) of the Marketing Agreement under the definition of Excess Amount.  The Excess Amount is the difference "between (x) and (y) where (x) equals the greater of: the average Sales Price for the Fruit or ninety-five percent (95%) of the USDA Mostly Price for the Fruit...".  If the 95% Guarantee was applied to the Sales Price then there would never be a need to determine the greater of the average Sales Price for the Fruit or 95% of the USDA Mostly Price for the Fruit as the Sales Price would always be equal to or greater than the 95% USDA Mostly Price.

3

What this Court now deems is the issue is how to calculate the End of Season Liquidation Amount and the Excess Amount. The relevant section of the Agreement, 7(g)(I) states as follows:

> On or before ten (10) days after the End of the Season, Chiquita shall prepare the End of Season Liquidation with respect to the Fruit and pay to Grower the End of Season Liquidation Amount (defined below). The amount due to Grower pursuant to such End of Season Liquidation will be what is left after subtracting the following from the Sales Price for all of the Fruit, in the following order of priority ("End of Season Liquidation Amount"):
>
> A. the aggregate amount of all advances made pursuant to Paragraph 7(a) hereof;
> B. the Commission, as adjusted in subparagraph 7(e) above and as further adjusted herein; for purposes of the End of Season Liquidation, the Commission for the Fruit shall be taken on the number equal to the sum of the Reference Price plus fifty percent (50%) of the Excess Amount, if any calculated on a per carton basis, described below; and
> C. all expenses incurred by Chiquita under this Agreement for the Grower's account, including, without limitation, the costs of any and all Required Operations other than those already paid by Grower.
>
> The Excess Amount, calculated on a per carton basis, whether positive or negative, shall be shared equally by Chiquita and Grower, and shall be added to (or subtracted from, as the case may be,) Grower's End of Season Liquidation Amount in the End of Season Liquidation by Chiquita. For purposes of this Agreement, the Excess Amount shall equal the difference, positive or negative, between (x) and (y), where (x) equals the greater of: the average Sales Price for the Fruit or ninety-five percent (95%) of the USDA Mostly Price for the Fruit, and where (y) equals the Reference Price for the Fruit. For purposes of this Agreement, the term "Mostly Price" shall mean the average "mostly" price reported by the USDA Market News, shipping point South Florida, during the first five days after the Fruit has arrived at the Receiving Warehouse. In the event that the USDA Market Report does not reflect the "mostly" price quotation, then the Mostly Price will be deemed to be equivalent to the middle range price of such report. This calculation shall be done separately for each type of Fruit specified in Schedule 7(a).

Based upon the above language of the Agreement it is clear that one must first calculate the Excess Amount in order to determine the End of Season Liquidation Amount. This is because 7(g)(i)(B) states that an adjusted commission shall be one of the items subtracted from the Sales Price to get to the End of Season Liquidation Amount and to determine this adjusted commission for the Fruit one must take the "number equal to the sum of the Reference Price plus fifty percent (50%) of the <u>Excess Amount</u>, if any calculated on a per carton basis." (Emphasis added).

The Excess Amount shall equal the difference between the greater of the average Sales Price for the Fruit or ninety-five percent (95%) of the USDA Mostly Price for the Fruit and the Reference Price for the Fruit. Once this number is calculated then it is divided by 50% and <u>added</u> to the Reference Price. This new number is then multiplied by a percentage to arrive at the commission for the Fruit. This commission is then subtracted, among other items, from the Sales Price.

Plaintiffs have taken issue with the Defendant's calculation of the Excess Amount. However, the Court finds that Plaintiffs' argument is not well taken. Here is how it should be calculated: Example A - 1,960 cartons of Size 6 Chiquita Cantaloupe

| Reference Price | Average Actual Price [Sales Price] | 95% USDA Mostly Price | Up or Down to Share [Excess] | Adjusted Price[1] to Growers |
|---|---|---|---|---|
| $8.73 | $5.98 | $6.51 | $-2.22 | $7.62[2] |

---

[1]This table, except as noted at FN 2, is taken from page 49 of Plaintiffs' presentation. It can also be found at Defendant's Revised Accounting at p. 5/17, behind the "Excess Amount" tab.

[2]The column is not in Defendant's Revised Accounting and was added by Plaintiffs in its presentation. This is the correct number that should be in this category. Plaintiffs' table says it should be $-4.87.

5

The 95% Price is greater than the Sales Price so the Court took that $6.51 and subtracted $8.73 from it to get $-2.22. The Court next took the Reference Price and added one-half of the Excess Amount to it to arrive at the adjusted price. $8.73 + $-1.11 = $7.62 which is the price from which the commission is now derived from.

Here is another example: Example B - 66 Cartons of Size 4 Chiquita Honeydews

| Reference Price | Average Actual Price [Sales Price] | 95% USDA Mostly Price | Up or Down to Share [Excess] | Adjusted Price[3] to Growers |
|---|---|---|---|---|
| $6.78 | $8.00 | $6.65 | $1.22 | $7.39[4] |

The Sales Price is greater than the 95% Price so the Court took that $8.00 and subtracted $6.78 from it to get $1.22. The Court next took the Reference Price and added one-half of the Excess Amount to it to arrive at the adjusted price. $6.78 + $0.61 = $7.39 which is the price from which the commission is now derived from.

Now that we have determined the Excess Amount, $-2.22 in Example A and $1.22 in Example B, as well as the adjusted price on which to determine the commission, $7.62 in Example A and $7.39 in Example B, we move on. The next calculation is to take the total "Sales Price for all of the Fruit" minus all advances, the commission, and expenses to arrive at the End of Season Liquidation Amount. However, in order to make this calculation the Court must determine what is the "Sales Price." Plaintiffs argue that it is the price actually charged to the customer. Defendant argues that it is the amount actually collected from the customer. The Agreement

---

[3]This table, except as noted at FN 4, was taken from Defendant's Revised Accounting at p. 5/17, behind the "Excess Amount" tab for Size 4 Chiquita- brand honeydews.

[4]The column is not in Defendant's Revised Accounting and was added by Plaintiffs in its presentation. This is the correct number that should be in this category. Plaintiffs' table says it should be $-8.61.

defines Sales Price as "the net F.O.B. shipping point prices per carton charged by Chiquita to its customers for the Produce, including all applicable upcharges for cooling and handling." Plaintiffs argue that the amount collected is less than the amount charged due to Defendant's problems with collections, accommodations made by Defendant to its customers and other downward adjustments. Defendants counter that "net" means what they collected and to find otherwise would make the use of "net" superfluous. Plaintiffs reply that "net" does not mean "collected" but instead refers to the price to paid based upon a sale F.O.B. and that if a customer wanted the melons sold at a "delivered" price then the Defendant would pay for that delivery expense and charge the customer so as not to include the delivery charge in the Sales Price. The Court finds this language somewhat ambiguous and looks to other portions of the contract for assistance. Section 8 of the Agreement provides that, "Collection of the proceeds of any sale under this Agreement shall be for the account of Chiquita, and Chiquita shall take all risk of collection on the Produce sold... . In all cases, Chiquita shall have sole responsibility for the invoicing and administrative/accounting dealings with Chiquita's customers." However, Section 1(c)(ii) gives Chiquita sole responsibility for sales activities and "[a]ny adjustments or other accommodations reached by Chiquita with Chiquita's customers are the sole responsibility and at the sole discretion of Chiquita and Grower shall have no right to protest or delay any such sales decisions." The Court would, in part, agree and disagree with both parties as follows: Accommodations made by Defendant to its customers and other downward adjustments are in their sole discretion; however, once accommodations, consistent with the intent of the Agreement, have been made the failure to collect falls on the shoulders' of

7

Defendant. Therefore, the parties will need to conduct an accounting to determine which monies result from "Any adjustments or other accommodations reached by Chiquita and its customers. . ." and which monies are the result of Chiquita's inability or failure to collect from its customers.

Once the End of Season Liquidation Amount is calculated the final step is to add the Excess Amount to it. Plaintiffs argue that any positive Excess Amount should be subtracted from the End of Season Liquidation Amount and any negative number should be added. The Court disagrees. The Agreement states "The Excess Amount, calculated on a per carton basis, whether positive or negative, shall be shared equally by Chiquita and Grower, and shall be added to (or subtracted from, as the case may be,) Grower's End of Season Liquidation Amount in the End of Season Liquidation by Chiquita." The Excess Amount is the difference between the Sales Price or 95% Guarantee and the Reference Price. The Reference Price is an agreed upon amount of money that is paid by Chiquita up front to the Plaintiffs. The purpose of this Excess Amount is to share in the gains and losses of selling the melons above or below the Reference Price as the case may be. In the examples above, Example A was sold below the Reference Price and Example B was sold above the Reference Price. Based upon the language of the Agreement, the Court finds that the Excess Amount should be <u>added</u> to the End of Season Liquidation Amount. This means that a negative number would then be subtracted from the End of Season Liquidation Amount as basic math dictates that the addition of a negative number requires the negative number to be subtracted. For example $b + (-a) = b - a$.

Finally, Plaintiffs argue that Defendant did not properly account for the End of Season Liquidation Amount because it does so on a "per vessel" calculation and not on a "per carton" calculation as required by the Agreement. As it appears to the Court, Defendant provided the "Average Actual Price" for each group of Melons on each vessel. For example, sticking with page 5/17 of Defendant's Revised Accounting behind the "Excess Amount" tab, Defendant listed vessel #SG422 as five separate categories to include Chiquita cantaloupe size 6, Chiquita cantaloupe size 9, Chiquita cantaloupe size 12, Non-Chiquita cantaloupe size 9 and Non-Chiquita cantaloupe size 12. Each category then provides the number of cartons received, the Reference Price, Average Actual Price and the 95% USDA Mostly Price. Based upon the information provided it is not possible to calculate the Sales Price per carton. Only the Average Actual Price per carton can be determined. This, however, is not what the Agreement provides. As Judge Watson pointed out, he Agreement says that the Sales Price is to be determine on a "per carton" basis. It does not say an average of the cartons per vessel. This holding does not conflict with the calculation of the Excess Amount. Although the Excess Amount is calculated by taking the greater of the <u>average</u> Sales Price for the Fruit or the 95% Mostly Price, this is to be calculated on a per carton basis since included in the definition of "Sales Price" is "per carton" and because Section 7(g) states "The Excess Amount, calculated on a per carton basis".

<u>Leave to Amend</u>

Plaintiffs also request that this Court reconsider Judge Watson's decision denying Plaintiffs' leave to file another amended Complaint. The Court declines to do so. This case was filed on October 4, 2002, five years ago and discovery is closed.

Fraudulent Inducement and PACA

Finally, Defendant's ask this Court to reconsider Judge Watson's denial of summary judgment to Chiquita on Plaintiffs' fraudulent inducement and Perishable Agricultural Commodities Act ("PACA") claims. The Court also declines to do so. In support of dismissal of the fraudulent inducement claim Defendant's cite *Captiva, Inc. V. Viz Comms., Inc.*, 85 Fed. Appx. 501, 506 (6th Cir. 2004)(unpublished) and states that "Proof that a party 'did not abide by his alleged promise does not, without more, permit the conclusion that he *never* intended to honor the promise.'" Here, although the breach of contract alone may not be sufficient to prove fraudulent inducement, there is a question of fact as to whether or not Chiquita ever intended to honor its promises as set forth in the Agreement. See also *Williams v. Edwards*, 129 Ohio App. 3d 116, 124 (1998)("An exception to this rule exists, however, where an individual makes a promise concerning a future action, occurrence, or conduct, and, at the time he makes it, has no intention of keeping the promise. In such a case, the individual possesses actual fraudulent intent and a claim for fraud may be asserted against him.").

As to the PACA claims, Judge Watson found and Plaintiffs argue that summary judgment is not appropriate as there are genuine issues of material fact. This Court agrees. Additionally, as Plaintiffs set forth, PACA remedies are available in addition to any state remedies that may be available.

Conclusion

Doc. 44, Doc. 47, Doc. 123, Doc. 124, Doc. 125, and Doc. 128 are DENIED, subject to refiling.  Doc. 142 and Doc. 147 are each GRANTED, in part and DENIED, in part.

Within in the next forty-five days, Defendant shall provide another accounting to Plaintiffs consistent with this Opinion and Order.  The parties are further order to attend a mediation session with Robert Kaiser, the District Court mediator, within 75 days from the date of this Opinion and Order.  The parties are directed to jointly contact Mr. Kaiser at 513-564-7330 to schedule this mediation.

The Final Pretrial Conference set for October 12, 2007 and Jury Trial set for November 13, 2007 are hereby vacated to allow sufficient time for Defendants to provide a proper accounting and for the parties to attend mediation.  The parties are to inform the Court of the mediation date.  A telephone conference will be held within ten days after the completion of the mediation.

As a housekeeping matter, per the parties stipulation at the June 27, 2007 hearing, the name of the Defendant shall be changed to Chiquita Fresh North America, LLC as it has absorbed Chiquita Frupac, Inc.

**IT IS SO ORDERED**.

 s/Michael R. Barrett  
Michael R. Barrett, Judge  
United States District Court